Announce our fourth case, please. The next case for argument is 164440, District of Minnesota, New Doe Child No. 1 et al. v. United States et al. Morning, Mr. Newdow. I'm Mike Newdow for the plaintiffs. May it please the court, there's a case called Masterpiece Cake Shop that I'm sure you're aware of with the Supreme Court right now. And that a case involves a homosexual couple that goes to for the decided to get married and wanted to get a wedding cake, went to a baker in Colorado and the baker, because of his religious beliefs, felt he could not, with good conscience, make the cake. And the United States has written an amicus brief. It actually has little Sturgill on his on its cover page. And they wrote in there when they started off their argument that this case involves two competing interests, an individual's right to speak or remain silent in accordance with his or her conscience and the government's desire to combat discrimination in commercial transactions. Both interests are undeniably important. And I think that's correct. And I think that's one of the problems that judges have all the time. And I mean, I don't know what the correct answer is to that case. It's very difficult. You have two competing interests and you have to decide which interest is more important than the other. Justice Alito referred to that problem when he had his confirmation hearing. He said, often there are conflicting freedoms and that makes the case difficult. And so in that case, with with the masterpiece cake shop, you know, is it more important that one person have his or her individual rights of religion upheld? Or is it more important that people don't get discriminated against on the basis of their sexual orientation or gender, race or anything else, obviously important, very difficult questions. And I'm glad I don't have to make them. But there's a corollary to Justice Alito's statement that often there are conflicting freedoms and that makes the case difficult. And that corollary is, is sometimes there's no conflicting freedom. There's just one freedom. And that's what we have in this case here. The only freedoms that we have are in my client's behalf. There's no conflicting freedom. You haven't heard one from the beginning of this case, from the first time that was argued in the district court, in the district court's opinion, in the appellate briefs. There's not a single compelling interest that's even proposed, no interest really at all. All we have is our excuses as to why it is okay to deprive my clients of their rights under the Establishment Clause, under the Free Exercise Clause, under the Free Speech Clause, under the Equal Protection Clause and under the Religious Freedom Restoration Act. And I think we should hear at least from their side at one point, what is it they're fighting for? What are they trying to uphold? And we know what they're trying to uphold. They're trying to uphold the idea that the majority can put their religious view out there as part and parcel of our government, which is exactly what the Establishment Clause forbids. We can start with the text. We always say, we start with the text. Let's get this text. In God we trust. You can't have more religious words. That's the national motto and we demand that it get imprinted on every coin and currency bill. And I think a good way to think of this is to maybe use something else. I mean, I think atheists are disenfranchised in this country and I don't know among judges as well as the lay public. But certainly, if we make it something else, another, because one of the arguments is that it's our history and tradition that, you know, we believed in God and atheists didn't really count for beings. Well, we had the same thing with other groups. For instance, Catholics. Our nation was founded on a hatred, a literal hatred of Catholicism. You know, there's a million cases. You know, Roger Williams and William Penn, for instance, they're our heroes for religious liberty. Roger Williams spoke of the Romish whore and then the Romish wolf and we had William Penn who wrote a 37-page treatise on why Catholicism is terrible. When the, when we were founded, we had the stamp, the declaration of the Stamp Act Congress talking about the free Protestant colonies. We had the declaration of the Suffolk Reserves. We had the Sheffield Declaration. When the Quebec Act was formed and was upheld by the parliament in England, the Continental Congress wrote and said, how could you possibly support a religion that has deluged your island in blood and dispersed in piety, bigotry, persecution, murder, and rebellion through every part of the world? We hated Catholics. It's in the Declaration of Independence. It sounds like you're starting with your establishment clause argument. Help me understand how we can sort of ignore what the Supreme Court has told us. We've gotten some, you've called it dicta, it probably is dicta in most of these cases, but it's what we have from our highest court on how we look at this particular motto. Well, I think it's very easy. We already have an example in the concurrence in Justice Douglas' concurrence in Engle v. Vitale, right? All you see in the Supreme Court, the only person who's ever said that it's unconstitutional is Justice O'Connor. And when she said that, she said no one joined her, right? The court has never come up with that. And if you look at in the concurrence in Engle v. Vitale, we have Justice Douglas saying, we have all these aides to religion. He has 17 federal aides to religion, right? And he's just making a statement. We have this, right? But when they went and looked at it, two of those aides, one of them was mandatory chapel in the service academies, and one of them was Bible reading in the District of Columbia, right? When they looked at those individual things, they turned out to be wrong. If you look carefully at what they wrote, they never say that it's okay. They just say we have it. Yeah, we have it. There's no denying we have it. But there's also been an indication that it serves a secular purpose, that it's part of, as you've described, the national history. I'm just trying to sort of understand how we as an appellate court below the Supremes would not be required to at least consider that about as strong of guidance as we've. Well, the main argument from the other side is the Allegheny County dictum, a dictum about dicta. They said, yes, we've previously considered this and said it's okay under the endorsement test. That's only one test, by the way. But in fact, if you look at what Justice Blackmun said throughout that opinion, he said, government may not promote or affiliate itself with any religious doctrine. I would choose that over this dictum about a dicta. He said that the establishment clause at the very least prohibits government from appearing to take a position on questions of religious belief. Is it not appearing to take a question on religious belief when it says in God we trust, knowing that we have people who don't trust in God? And again, I would go back to just change it, all right? Change it and say we have five Catholics and three Jewish justices right now. Imagine what they would say if instead it said in Protestant Christianity we trust. Do you think that they would hold that as constitutional? I think not. They're thinking in terms of, you know, what they have their lives where it does not include atheists. And I think they should do that. Just like they didn't do it in Dred Scott v. Sanford, just as they didn't do it in Myra Bradwell v. Illinois. Yeah, if we had eight black or nine black justices in those cases in Plessy or in Sanford v. Scott, would we ever have come out with that result? Not a chance. If Myra Bradwell was before a panel of women, would they say, no, you shouldn't be a lawyer? Not a chance. If I were before a panel of atheists, I wouldn't have to say a word, right? It's so clear. So I don't think the Supreme Court has ever said definitively there's only one justice who ever said it definitively. All they said is we have all these things and we have, again, in the concurrence in Engel v. Vitale, we have the Supreme Court doing that and finding out that, in fact, when we look at the individual situations, it's unconstitutional. And I doubt that the Supreme Court knows about the beginning of this. I mean, we have the department, the Treasury Department on its own, on its own website. It's been there at least 15 years. I just checked this morning. It's still there. It says this was caused by, brought about by increased religious sentiment. They're admitting it. They go through the whole history, how a minister of the gospel wrote, said we've got to get God in our government, how the secretary of the treasury says the trust of our people in God should be declared on our national point. Nothing about history. Nothing about this makes you feel good and this, you know, expresses confidence in the future or anything else, which, by the way, is a very bigoted view, right? I mean, atheists don't think that. Atheists don't find this to be, you know, encouraging the recognition of what's worthy of a society, et cetera. We see the exact opposite. My clients see the exact opposite. They're looking at it from the point of view of people who believe in God and they need to hear from an advocate who say, wait a second, you're not seeing everything here. And they haven't had that opportunity. And when they get briefed on this and they find out that the director of the Minsk said we claim to be a Christian nation, our national coinage to declare our trust in God, which one? Him who is king of kings and lord of lords, that's Jesus Christ. I think they would say, well, wait a second, maybe we got this wrong, all right? In the meantime, you have principle after principle statement. You have them saying in McCreary County, the touchstone for our analysis is the principle that the first amendment mandates governmental neutrality between religion and religion and between religion and non-religion, between trust in God and not trust in God. It mandates neutrality. That's a principled statement which they've made in over 40 cases. You never see 40 cases that have the same principle, right? They've said that. Now, you as a lower court, you have your choice. Okay, do I look at these dicta that mean nothing that have no briefing whatsoever on the issue that they simply refer to knowing that when they do refer to it, as we saw in Engle v. Vitali, that in fact, they can overturn it because it isn't consistent with all of their principles? Or do you look at these principles that come one after another? What principle are we upholding saying that we can have in God we trust as a national motto? Our establishment clause, I mean, the first 10 words of the Bill of Rights, Congress shall make no law respecting, having anything to do with an establishment of religion. And then we make our national motto in God, it's like a joke. I mean, this is crazy. And nobody has been able to get to the Supreme Court to even make that argument. And I think you need to allow that. What about your RFRA claim? The RFRA claim is certainly, you know, you don't like to do constitutional issues. I think we're clearly powerful on that one as well. I don't think it's as powerful as the establishment clause. And that's why I'm focusing there. But if you want to go and stop at RFRA, you certainly can. Right? The government does not allow that. This is, you can't substantially burden anyone's religious exercise, right? They said. And one of the ways you can do that is you can't cause someone to forfeit their benefits. There is a benefit to using the coins and currency in our society. And my clients cannot do that without violating their religious beliefs. And express for me succinctly what that belief, that religious belief is in using the currency. You're carrying around, I mean, they're carrying around on their persons all the time and proselytizing as it is intended to do. You have in the record there multiple occasions where they said the reason we want and God we trust on the coins is so we can go behind the iron curtain so we can go to the world and tell the world we believe in God. Right? And you're asking us, I mean, this is, it's a free speech as well as a free exercise. So it's using as currency something with those words. It's as simple as that. It's just as simple as that. To have in your pocket as an atheist, I mean, think about, you know, pick any other. You know, go back to Catholicism. Make believe you have in your pocket the words of John Jay, the first Chief Justice of the United States Supreme Court. You know, that Catholics are, you know, the whore of Rome, et cetera. Would you carry that? Would you wear that? I mean, you know, that's a pretty offensive thing to do. It's pretty offensive for atheists to carry around this statement that they completely disagree with. That not only that, it tributes to them, right? It says in God we trust. We clearly means the American people. Are they not American people? They have to walk around saying this lie that I trust in God? That's, you know, think how direct that is and compare that to Hobby Lobby where, I mean, it's this completely attenuated situation and the Supreme Court said that's enough. It bothers them. They sincerely believe it and I don't think there's any indication that my clients don't sincerely believe what they're saying. And they, I'm going to check my, I didn't look at it. I see I'm past something. So, anyhow, I think by comparing it to Hobby Lobby which is so attenuated versus having to carry this stuff on their body, I think it's a much stronger. Other circuits have considered this question, haven't they? They have and you look at their rulings and I personally get embarrassed to be in a country with that. I mean, there's not a single circuit that's adopted your position. It's amazing. That's what anti-atheism does. And imagine if it said in Protestant Christianity we trust. Do you think we'd have five circuits saying no? Absolutely not. They don't care about atheists. We are disenfranchised. You have statistic after statistic and 27% of the population doesn't think they should be able to vote. I mean, this is incredible. In the Masterpiece Cake Shop, you have the Phil, Mr. what's his name, Mark Phillips, whatever his name was. He sits, Jack Phillips. He says, oh, you know, there's, we don't do cakes not just for gays, we don't do cakes for Halloween. We don't do cakes for, there's three things we won't promote. What are those three things? Racism, indecency, and atheism. Can you imagine this? I mean, this goes on. I bet you that 90% of the judges who read that brief and the lawyers don't even, their eyes go right over it. I mean, atheists are so disenfranchised in this country. Every single study shows that. And so you have these judges. I mean, how can you possibly say that in God we trust has nothing whatsoever to do with an establishment of religion? I mean, it's pure drivel. And it's, again, it's embarrassing. If you find anything in those, when I come back for my minute and 50 seconds of rebuttal, if you can think of anything in any of those decisions that makes any sense that sounds reasonable, please let me know. Thank you. Thank you, Mr. Newdow. Good morning. May it please the court. I'm Lowell Sturgill from the Department of Justice representing the federal defendants. We believe the district court correctly dismissed each of the claims in plaintiff's complaint. I'd begin with the establishment clause claim because that's where we began this morning. As our brief explains in the Supreme Court and in this court, decisions have, although you could consider it dicta, but it's considered dicta and we believe it's controlling and now holding for reasons I'll explain, but held that the, the motto on coins and currency is a reference to our religious heritage and it's an acknowledgement of religion as opposed to an endorsement of religion. The Supreme Court said this in the Lynch decision flat out. And it reaffirmed this in the County of Allegheny case and linked it up to Justice O'Connor's endorsement test and said, by the way, this also is consistent with that endorsement principle and this court in the Chambers versus Marsh case made the same point and called the motto on coins and currency, a permissible, a ceremonial reference to religion, very much like the opening in court today where the court cry was, you know, God, you have to save this honorable court. So if that's constitutional, then again, you know, this court has said that the motto is similar. Those, the cases, at least from the Supreme Court are relatively old. I mean, the most recent, maybe late eighties. And since then we do have RFRA. I mean, do you think that there's any reason that we should be reconsidering the way the court might consider this issue of religion, whether it be an establishment clause or in the related RFRA claim? So I see nothing in the RFRA or the court cases that would cause the court to reconsider the establishment clause question itself. No case of which I'm aware has questioned how Lynch and County of Allegheny and Chambers from this court view the motto on coins and currency. It's helpful, I think, to note that also in 2002, Congress enacted a statute that reaffirmed the motto and it specifically referred to the purpose of the motto as being, as we describe it, as Supreme Court described it in Lynch. So I think if you're looking for establishment clause for purposes, for a concurrent modern statement of what the purpose is of the motto, that's the best place to look. And that's where the Ninth Circuit looked in the pledge case in Newdale versus Rio Linda. So there is support for that as well. And I think it's important to note that what in God we trust is in the motto is as the, if you go back to the 1954 House Committee report, it refers to that as essentially a shorthand, it said it's a terse and dignified way to basically represent the proposition that the country was formed by founders who believed that we have inalienable rights and that those came from a God. And that's why people could feel confident about the fact that those rights would be inalienable and lend their support to the constitution. Mr. Newdow contends, and perhaps with some validity that under the first amendment that carrying coins and bills around and using them is forcing them to proselytize religion when they do not believe it, believe in it. Are there any alternatives to that, that they could use and if so, does that have any bearing on how a case like this should be decided? I would believe it does. Your honor, as our brief explains, plaintiffs can use credit cards and debit cards and checks for almost all transactions, except for those that are fairly trivial. What about the new bitcoins now that seem to be holding sway all over the world? Those are used basically for the same purpose, aren't they? I'm not an expert on bitcoins. I'm afraid I haven't run into an expert on bitcoins, but I read it up in the wall street journal, but, and gold coins, credit cards and things like that. Has that been discussed at all? So I don't think bitcoin has been discussed in the cases, but it's certainly another alternative. And we think those are relevant. If you're looking what a substantial burden on the exerciser of religion constitutes, the main case is the Sherbert case from the Supreme court. And there the plaintiff was unable to obtain an unemployment compensation. And that was what placed a substantial pressure on the person to give up their religious beliefs. And we think that the inability to put a coin in a coin laundry is really not the same kind of burden. That's a kind distinction. In terms of the proselytization claim, we pointed out that in the Supreme court and the Woolley versus Maynard case held specifically held that nobody's compelled to proselytize the national motto merely by carrying it on coins and currency. So we think that is controlling because again, in a RFRA case, you mentioned RFRA, it's the plaintiff's burden in a RFRA case, not only to identify what their exercise of religion is, but to show that the government's action has compelled them to forego that exercise of religion. So the RFRA analysis though is different than the establishment clause analysis. And so, you know, the substantial burden, I think that the case law is pretty clear. You don't question very closely whether it's a sincerely held belief and then the substantial burden, you know, passing around currency daily, if you're not a credit card user, if you don't use it on a daily basis with something that you disagree with, why doesn't that at least reach some sort of threshold problem for someone who really not only disagrees, but it's just fundamentally counter to their spiritual or religious belief system. Sure. So I think we have two main answers. One is apart from the establishment clause, Woolley versus Maynard was a free speech case. Um, but the withholding in the case I think is controlling on the compulsion issue under RFRA. Again, as you said, under RFRA, the court is not supposed to second guess the individual's identification of what their religion requires and what their belief is, but there's a separate requirement that is they have to show compulsion. They have to show that the burden is substantial enough to count as RFRA prima facie case. And I think here, what they're saying is we're compelled to proselytize religion because of the presence of the motto on coins and currency. I think Woolley expressly rejects that case. I think as a matter of precedent, you have a Supreme court case saying that does not amount to the level of compulsion that could create a free speech claim. And, you know, by the same token, it, there's no sense in which it should be able to then provide a substantial burden under RFRA. So that's, that's our first argument. Our second one is that, um, in cases, the Ling and Bowen cases, the Supreme court held that, um, the notion of a burden under RFRA does not include situations where a plaintiff is trying to second guess an internal decision by the government about its own internal affairs. Ling is the best example. That was where, um, plaintiffs were trying to tell the government what it could do with its own land. Government wanted to build a road on it. And they said, uh, we don't, that just offends our religious beliefs and it would preclude us from using the road, the land that the road is on. Supreme court said that, that RFRA, that that was a free exercise clause. It said the free exercise clause, the notion of free exercise of religion, doesn't give anybody the right to demand that somebody else use their own land the way the religious person would want them to. And I think there's a parallel here because essentially what the plaintiffs want is for the government, they want to be able to redesign coins and currency to meet their own religious needs. And, you know, it's the government basically in the constitution that's entitled to and responsible for coming up with the designs and minting coins and currency. So we think under the Ling and Bowen cases that, uh, that, that should show that there's no substantial burden. And then the second part of that, which I think is related, is that the plaintiffs themselves maintain that the motto on coins and currency constitutes government speech. And there's no case of which I'm aware of, which would say that RFRA or any other statute gives anybody the right to countermand what would be government speech. And maybe, maybe Congress could alleviate the problem a little bit by, uh, passing a law that says that all coin operated machines, uh, coin laundries and so forth be, uh, activated by a plastic, uh, simulated coin. And you, they could write a check for the, for those, and that would alleviate a lot of the problem of, of being proselytizing through using coins for those purposes. Would that, anybody thought of that or? I'm happy to report that back to my clients. I think that that would certainly alleviate the problem, but, you know, I think that under RFRA or, and other, the other claims the plaintiffs have brought, there's no obligation on the government to do that because in order, for example, under RFRA, uh, the government, the plaintiff has to show a substantial burden on the free exercise of religion in order to trigger the government's obligation to show that it has a compelling interest. So you really, I think under RFRA never get to that question because they can't show a substantial... What if you do though? What if you get to the compelling governmental interest? Is there one? Yes. Uh, the interest is, first of all, again, the plaintiffs contend, I think rightly that the motto is government speech and the Supreme Court in Lynch and County of Allegheny have rightly held that the motto is really a sui generis way that the government can express this notion that I've mentioned before and that the Supreme Court itself in the Shemp case, which the plaintiff likes to cite, um, also has acknowledged, which is that again, um, the motto reflects the fact that the framers founded the country on the notion that we have inalienable rights and that those rights can be counted upon because they are guaranteed by a source. Yes. And if you, if you take that as a, as a compelling government interest, what links it up to the, to the currency? So, so if that is a compelling governmental interest to express this historical reliance on what you've described, why not put it on something that, um, an American citizen could honor or not by choice? Because the currency is something that we, even though I know folks are using debit cards and credit cards more and more, I still use cash. A lot of people do. Sure. So how is that the compelling part, right? You know, that seems like there's two point parts to that, right? That, that, that you've got this motto, but why on the currency? Right. So I think it has to do with the fact that currency is, um, it is ubiquitous, but it does represent something that's an official government, uh, statement. It's, um, it's, it's used by people. It's a, it's a very, it's really uniquely effective way for the government to communicate that message. Because again, uh, coins and currency are so prevalent. So if you, if the government really does have a compelling interest, which we think it does in making this public statement and plaintiffs themselves quote the mint about saying that I just, this is so important to the government that we need Soviets. There are no Soviets anymore, but there were at the time of 1954. And to know what, you know, that we have a different form of government. We have a form of government that's democratic forum based on inalienable rights, which they didn't have. And that's based on this notion that the founders had that they, you know, they came from a God that those rights couldn't be taken away. So you would, the place you would want to have that is on coins and currency, which again is the official government coinage, which the constitution requires and authorizes the government to mint and coin. So it's the perfect place to put it. And, you know, I think also RIFRA doesn't require that level of analysis where the court could just second guess Congress's judgment about what the best way is to proclaim the basic notions that distinguish our form of government from other forms of government. That's, that's, I think what the answer is. Um, the other claims are, I believe, um, inadequate for the reasons explained in our brief, the free speech clause claim, I think, again, is foreclosed by Woolley versus Maynard, which said there's no coercion to proselytize the motto just by carrying coins and currency, but also if, if the plaintiffs are right and that we think they are in this respect, that the motto is government speech while the free speech clause doesn't apply to government speech, the Pleasant Valley versus Summon case tells us that. So the other claims are the free exercise clause and equal protection clause. And again, those clauses are basically require government neutrality toward religion, and we think the establishment clause holdings from Lynch and County of Allegheny and this court's decision in Marsh take care of those claims as well. Because if you accept the notion, which we think you should, that the, uh, motto again is a shorthand way of referring to this democratic principle that I've laid out, then that's a purely secular notion. And so it's religiously neutral for purposes, again, of the free exercise and equal protection clauses. I believe that's all I wanted to cover this morning, but happy to answer any more questions or, um. Hearing none. Thank you very much. Thank you. I just lost the ton of things I had here. Okay. A minute and 44 seconds. This is an official government statement in God. We trust. I think I can rest my case with that. Children can't use credit cards and checks. So we still have children plaintiffs here. So that's not going to take care of it. Compelling interest. Again, I would substitute in Protestant Christianity. We trust. Would anyone ever say that's a compelling interest? Because our nation was founded on Protestant Christianity, George Washington, and John Adams signed the articles of association, the free pre-Protestant colonies. Um, the government may not compel an unwilling speaker to join in a group, uh, at odds with his religious or moral beliefs and the government may not compel the dissemination of its own preferred message that's a directly out of the brief and the masterpiece case, a masterpiece cake shop case from the government themselves. Uh, the idea that Wooley expressively refutes coercion. I don't know where they get that. Ling. It's a completely different case. Ling had a government doing something that was not religious here. They're making a motto in God. We trust the idea that those two things somehow equate is absurd. Um, and how much time you got left? 46 seconds. I'm going great. Um, so the sum of them case, some of them is government speech where somebody walks by in the government speaking. That's fine. That's not the case. You're here. They're physically carrying this money around. And some of them did not discuss the fact that there's an establishment clause violation. Yes, it's government speech, but government speech is not allowed to include, uh, uh, references to religion, not references, endorsements of religion, which is clearly what we have here. Justice Scalia said government may not lend its power to one or the other side and controversies over religious dogma, the greatest controversy over religious dogma is whether or not God exists and to tell, claim that government is not lending its power to one or the other side. And that is absolutely absurd. It was six seconds left. Cool. If the government were to print currency and coin and make coins both ways with the model and without the model, uh, would that satisfy your approach? I think government should stay out of the religion business, but if they're going to get into it, then they have to accommodate all views. So if they had God, we trust and knowing God, we trust and in atheism, we trust and God is a myth, then that would be fine, but if they're going to take sides, which government may not do, then no, that doesn't make it either. This isn't even a close case. I mean, this is ridiculous. We have these minimal statements by the Supreme court and, and clear enunciated principles time and time again. We just talked about neutrality. We have all the others. That would solve the carrying around problem that you just, then you'd have to go out and find and short coins. Why don't we just get the government to stay out of the religion business and not making a claim that is completely contrary to the first 10 words of the bill of rights. That would solve it the best. I think so. Very good. Thank you very much. Appreciate it. So we appreciate your arguments today and your briefing. We'll decide this interesting case in due course.